**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **NO. 3:19-CR-245-M** |
| | § | |
| **TIMOTHY BERNARD TANNER,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENSE'S MOTION FOR CONTINUANCE OF TRIAL**
**AND PRETRIAL DEADLINES**

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ………………………………………………………iv

**ARGUMENT** ……………………………………………………………………..1

  I.      **The Dallas Division of the Northern District of Texas**
           **stands at the peak of a dire public health emergency** ………………………………1

  II.    **The denial of a continuance would be an abuse of**
          **Discretion** …………………………………………………………………11

      A.    **Trial at the local peak of a deadly, highly contagious pandemic would**
           **impair the defendant's right to effective of assistance of counsel** …………….12

      B.    **Trial at the local peak of a deadly pandemic would deprive the defendant**
           **of trial before a fair cross-section of the community.** …………………….....17

      C.    **Trial at the local peak of a deadly pandemic would compromise the**
           **defendant's right to meaningful confrontation**………………………………... 22

      D.    **Trial at the local peak of a deadly pandemic would compromise the**
           **defendant's right to compulsory process, to present evidence, and to**
           **testify.** ……………………………………………………………………23

      E.    **Trial at the local peak of a deadly pandemic would compromise the**
           **defendant's right to be present and to be judged without the effect**
           **of a prejudicial face-covering.** ……………………………………………26

      F.    **Trial at the local peak of a deadly pandemic would compromise the**
           **defendant's right to be trial by an impartial jury and to be free of**
           **coercive verdicts.** …………………………………………………………..28

      G.    **Trial at the local peak of a deadly pandemic would compromise the**
           **defendant's right to be free of coercive pressure to plead guilty.** ……………..29

      H.    **Trial at the local peak of a deadly pandemic would violate the**
           **defendant's due process right to the exercise of reasonable care toward**
           **the health and safety of persons confined by state action.** ………………….30

  III.   **Assuming that its discretion is not constrained by its duty to provide a fair trial**
       **and protect the health of participants, this Court should nonetheless exercise its**
       **discretion in favor of a continuance.** ……………………………………...........31

  IV.   **A continuance would not prejudice the government.** ………………………….31

**V.      Conclusion** …………………………………………………………………....**32**

**Certificate of Conference** …………………………………………………………..**34**

**Certificate of Defendant's Consent** ……………………………………………………**34**

**Certificate of Service** ……………………………………………………………**34**

## Table of Authorities

**Cases**                                                                      **Page(s)**

*Brady v. United States*, 397 U.S. 742 (1970)  ................................................................. 29

*Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001) (en banc)  ................................................. 13

*California v. Green*, 399 U.S. 149 (1970)  ..................................................................... 22

*Chambers v. Florida*, 309 U.S. 227 (1940)  ................................................................... 29

*Chambers v. Mississippi*, 410 U.S. 284 (1973)  ............................................................... 23

*Coy v. Iowa*, 487 U.S. 1012 (1988)  .......................................................................... 22

*Deck v. Missouri*, 544 U.S. 622 (2005)  ...................................................................... 26

*DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 195 (1989) .......................... 30

*Dickerson v. Alabama*, 667 F.2d 1364 (5th Cir. 1982)  ....................................................... 11

*Duren v. Missouri*, 439 U.S. 357 (1976)  ..................................................................... 17

*Estelle v. Williams*, 425 U.S. 501 (1976)  ................................................................... 26

*Freeman v. Ferguson*, 911 F.2d 52 (8th Cir.1990)  ........................................................... 30

*Geders v. United States*, 425 U.S. 80 (1976)  ................................................................ 14

*Gregory v. City of Rogers, Ark*, 974 F.2d 1006 (8th Cir. 1992) (en banc)  ................................. 30

*Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985)  ............................................................. 30

*Jordan v. Massachusetts*, 225 U.S. 167 (1912)  ............................................................... 28

*Kercheval v. United States*, 274 U.S. 220 (1927)  ........................................................... 29

*United States v. Kimbrough*, 69 F.3d 723, 731 (5th Cir. 1993).  ............................................ 12

*Kirby v. Illinois*, 406 U.S. 682 (1972)  ..................................................................... 12

*Machibroda v. United States*, 368 U.S. 487 (1962)  .......................................................... 29

*Maine v. Moulton*, 474 U.S. 159 (1985)  ...................................................................... 16

*Maryland v. Craig*, 497 U.S. 836 (1990)  ..................................................................... 22

*Mattox v. United States*, 156 U.S. 237 (1896)  .............................................................. 22

*Montejo v. Louisiana*, 556 U.S. 778 (2009)  ................................................................. 12

*Morris v. Slappy*, 461 U.S. 1 (1983)  ........................................................................ 17

*Perry v. Leeke*, 488 U.S. 272 (1989)  ........................................................................ 12

*Powell v. Alabama*, 287 U.S. 45 (1932)  ...................................................................... 13

*Rock v. Arkansas*, 483 U.S. 44 (1987)  ....................................................................... 23

*Romero v. State*, 173 S.W.3d 502 (Tex.Crim.App.2005)  ....................................................... 22

iv

*Smith v. Robbins*, 528 U.S. 259 (2000) ............................................................... 12

*State v. Long*, 499 A.2d 264 (N.J. 1985) ............................................................. 21

*Tanner v. United States*, 483 U.S. 107 (1987) ..................................................... 28

*Taylor v. Illinois*, 484 U.S. 400 (1987) ............................................................... 23

*Ungar v. Sarafite*, 376 U.S. 575 (1964) .......................................................... 1, 17

*United States v. Cronic*, 466 U.S. 648 (1984) ..................................................... 13

*United States v. DeJesus-Castaneda*, 705 F.3d 1117 (9th Cir. 2013) .................. 22

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) ................................... 22

*United States v. Fossler*, 597 F.2d 478 (5th Cir. 1979) ....................................... 28

*United States v. Hemmingson*, 157 F.3d 347 (5th Cir. 1998) ............................... 17

*United States v. Kennedy*, 548 F.2d 608 (5th Cir.1977) ...................................... 17

*United States v. Kimmel*, 777 F.2d 290 (5th Cir. 1985) ....................................... 29

*United States v. McDonald*, 620 F.2d 559 (5th Cir. 1980) ................................... 15

*United States v. Mendoza*, 522 F.3d 482 (5th Cir. 2008) ..................................... 15

*United States v. Rhodes*, 631 F.2d 43 (5th Cir. 1980) .......................................... 28

*United States v. Roberson*, 496 Fed. Appx. 390 (5th Cir. 2012) .......................... 27

*United States v. Ross*, 58 F.3d 154 (5th Cir. 1994) .............................................. 11

*United States v. Sahley*, 526 F.2d 913 (5th Cir. 1976) ........................................ 11

*United States v. Snarr*, 704 F.3d 368 (5th Cir. 2013) .......................................... 21

*Waley v. Johnston*, 316 U.S. 101 (1942) ............................................................. 29

*Walker v. Johnston*, 312 U.S. 275 (1941) ............................................................ 29

*Washington v. Texas*, 388 U.S. 14 (1967) ............................................................ 23

*Weatherford v. Bursey*, 429 U.S. 545 (1977) ...................................................... 14

*Wells v. Walker*, 852 F.2d 368 (8th Cir.1988) ..................................................... 30

**Statutes**

28 U.S.C. § 1861 .................................................................................................. 17

28 U.S.C. § 1867 .................................................................................................. 17

**United States Constitution**

U.S. Const. Amend. VI ..................................................................................... 22-23

**Miscellaneous**

Aaron Thomas, *Why I don't feel safe wearing a face mask. I'm a Black man living in this world. I want to stay alive, but I also want to stay alive*, Boston Globe (April 5, 2020), *available at https://www.bostonglobe.com/2020/04/05/opinion/why-i-dont-feel-safe-wearing-face-mask/, last visited May 15, 2020.* .............................................................................................................. 27

Anchordoqui LA, Chudnovsky EM. *A physicist view of the airborne infection.* Cornell University website. (Mar. 30, 2020), *available at https://arxiv.org/abs/2003.13689, last visited May 15, 2020.* .......................................................................................................................... 5

Adriana Rodriguez, *Should we all wear face masks to fight coronavirus? CDC says no, guidelines remain unchanged*, USA Today, (March 31, 2020)(quoting Executive Director Dr. Mike Ryan), *available at https://www.usatoday.com/story/news/health/2020/03/31/coronavirus-masks-n-95-surgical-diy-should-we-all-wearing-one/5093429002/ last visited May 15, 2020....................* 7

Centers for Disease Control and Prevention, Cases in the U.S. (May 15, 2020), *available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, last visited May 17, 2020* .......................................................................................................................... 1, 10

Centers for Disease Control and Prevention, What You Need To Know About Coronavirus Disease 2019 (COVID-19), CDC (2020), *available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf, last visited May 15, 2020.* ..................................... 2, 3

Centers for Disease Control and Prevention, *What Healthcare Personnel Should Know about Caring for Patients with Confirmed or Possible Coronavirus Disease 2019 (COVID-19),* (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/caring-for-patients-H.pdf. .............. 5

Center for Disease Control and Prevention, *Airborne Infection Isolation Room (AIIR),* (Nov 5, 2015), https://www.cdc.gov/infectioncontrol/guidelines/isolation/glossary.html. .................... 5, 6

Centers for Disease Control and Prevention, *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission* (Apr. 3, 2020), *available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html, last visited May 15, 2020*........................................................................................... 4

Centers for Disease Control, *COVID-19 in Racial and Ethnic Minority Groups*, (April 22, 2020) *available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html., last visited* May 14, 2020. . ....................................................................... 18-19

Chandini MacIntyre et al, *COVID-19, shortages of masks and the use of cloth masks as a last resort,* BMJ Open (March 30, 2020), *available at https://bmjopen.bmj.com/content/5/4/e006577.responses#covid-19-shortages-of-masks-and-the-use-of-cloth-masks-as-a-last-resort, last visited May 15, 2020.* .................................................. 6

Chris Ciaccia, *Coronavirus Can Remain in Air for 3 Hours, Live on Plastic for Days, New Study Says*, (Mar. 12, 2020), https://www.foxnews.com/health/coronavirus-live-plastic-stainless-steel-for-up-to-3-days..................................................................................................................... 4

*Coronavirus Disease 2019 (Covid-19) Situation Report – 46*, World Health Org, at p. 2 (2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200306-sitrep-46-covid-19.pdf?sfvrsn=96b04adf_2. ................................................................................................ 3

Cory Shaffer, *An Ohio Judge Determined to Hold a Trial, A Defendant Removed from the Courtroom with Coronavirus Symptoms Illustrate Perils of Pandemic-era Trials*, (May 1, 2020), *https://www.cleveland.com/court-justice/2020/05/an-ohio-judge-determined-to-hold-a-trial-a-defendant-removed-from-the-courtroom-with-coronavirus-symptoms-illustrate-perils-of-pandemic-era-trials.html, last visited May 11, 2020.* ................................................................ 9

*Dallas County Health and Human Services 2019 Novel Coronavirus (COVID-19) Press Releases*, *available at* https://www.dallascounty.org/covid-19/judge-press-releases.php*, last visited May 18, 2020.* ...................................................................................................................... 2, 4

George Back, *Andrew Cuomo on 'selfish' New Yorkers not wearing masks: 'I just don't get it'*, Yahoo Entertainment (May 7, 2020), *available at https://sports.yahoo.com/andrew-cuomo-on-selfish-new-yorkers-not-wearing-masks-i-just-dont-get-it-074031942.html, last visited May 15, 2020.* ....................................................................................................................... 28

Graham Readfearn, *What Happens to People's Lungs When They Get Coronavirus*, The Guardian, (Mar. 24, 2020), https://www.theguardian.com/world/2020/apr/01/what-happens-to-peoples-lungs-when-they-get-coronavirus-acute-respiratory-covid-19 ........................................... 2

Harold Pashler, *Dual-task interference in simple tasks: Data and theory*, Psychological Bulletin, 116(2), 220–244 (1994), *abstract available https://psycnet.apa.org/doiLanding?doi=10.1037%2F0033-2909.116.2.220, last visited May 14, 2020.* ....................................................................................................................... 14

Jury Plan for the Northern District of Texas, as Amended June 2008, Art. VI (2008), *available at http://www.txnd.uscourts.gov/sites/default/files/orders/misc/MiscOrder5_11209Jury.pdf, last visited May 14, 2020.* ................................................................................................................ 19

Lidia Morawska and Junji Cao, U.S. National Library of Medicine National Institutes of Health, *Airborne Transmission of SARS-CoV-2: the World Should Face the Reality* (Apr. 10, 2020), *available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7151430/, last visited May 15, 2020.* ....................................................................................................................... 6

Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica, (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients. ................. 2

Lu J, Gu J, Li K, Xu C, Su W, Lai Z, et al, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020*. EMERG INFECT DIS. 2020 Jul (Apr. 2, 2020), *available at https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article, last visited May 15, 2020* ................... 5

Mark Hugo Lopez, et al, *Financial and health impacts of COVID-19 vary widely by race and ethnicity*, Pew Research Center (May 5, 2020)("There are sharp racial and ethnic differences in personal experiences with COVID-19 and in concerns about spreading or catching the virus."), *available at https://www.pewresearch.org/fact-tank/2020/05/05/financial-and-health-impacts-of-covid-19-vary-widely-by-race-and-ethnicity/ , last visited May 14, 2020. .* ................................ 17

Neeltje van Doremalen, et. al, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England J. Med., (March 17, 2020), *available at* https://www.nejm.org/doi/full/10.1056/NEJMc2004973*, last visited May 15, 2020.* .................... 4

Northern District of Texas Special Order 13-5 (March 13, 2020), *available at http://www.txnd.uscourts.gov/sites/default/files/documents/COVID19.pdf, last visited May 15, 020. .* ........................................................................................................................... 8, 10

Parkland Website, *Parkland welcomes donations of personal protective equipment*, available at https://www.parklandhospital.com/ppe-donations, last visited May 15, 2020. ............................ 6

Dr. Ramananda Ningthoujam, *COVID 19 can spread through breathing, talking, study estimates*, Curr Med Res Pract (May 8, 2020), *available at*

*https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7205645/, last visited May 15, 2020.* ............... 4

Ryan Lizza and Daniel Lippman, *Wearing a mask is for smug liberals. Refusing to is for reckless Republicans* (May 1, 2020), *available at https://www.politico.com/news/2020/05/01/masks-politics-coronavirus-227765, last visited May 17, 2020.* .......................................................... 27

Santarpia JL, Rivera DN, Herrera V, et al, *Transmission potential of SARS-CoV-2 in viral shedding observed at the University of Nebraska Medical Center* (published online Mar. 26, 2020), *available at https://doi.org/10.1101/2020.03.23.20039446, last visited May 15, 2020.* ..... 5

*Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020*, CDC, at tbl. (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w. ................... 3

Tian-Yuan Xiong et al., *Coronaviruses and the Cardiovascular System: Acute and Long-Term Implications*, European Heart Journal, at 1 (2020). ...................................................................... 2

University of Texas COVID-19 Modeling Consortium, *COVID-19 Mortality Projections for US States and Metropolitan Areas, Deaths Per Day for Dallas-Fort Worth-Arlington, Input = Texas, Dallas-Fort Worth-Arlington* (May 15, 2020), *https://covid-19.tacc.utexas.edu/projections/, last visited May 15, 2020*. ................................................................................................................... 3

Will Weissert and Jonathan Lemire, *Face masks make a political statement in era of coronavirus*, Associated Press, (May 7, 2020), *available at https://apnews.com/7dce310db6e85b31d735e81d0af6769c, last visited May 15, 2020*................. 7

**ARGUMENT**

Defendant, **TIMOTHY BERNARD TANNER**, by his appointed counsel, Assistant Federal Public Defender Michael Kawi, hereby moves this Court for an order continuing the trial and related dates set in this case and for a finding of excludable time under the Speedy Trial Act as found in Title 18, United States Code, §§ 3161, *et seq.* In support of this request, counsel states the following:

## I.    The Dallas Division of the Northern District of Texas stands at the peak of a dire public health emergency.

We are under siege. The rapid spread of a deadly infectious agent, the novel coronavirus, COVID-19, is killing and maiming us, and it is devastating our economy. And the vast scale of disruption occasioned by the virus makes clear understanding of its effects on social and economic consequences difficult.

More than 1.4 million people in America have contracted the disease since February and we have lost 87,315 lives.[1] Over the past two weeks Dallas County has seen between 199 to 253 new cases and ten new hospitalizations *each day*.[2] Dr. Phillip Huang, Dallas county's health and human services director, said "The state and county have not seen a sustained 14-day drop in new cases –

---

[1] *See* Centers for Disease Control and Prevention, Cases in the U.S. (May 15, 2020), *available at* *https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html*, *last visited May 17, 2020.*

[2] *See Dallas County Health and Human Services 2019 Novel Coronavirus (COVID-19) Press Releases*, *available at* https://www.dallascounty.org/covid-19/judge-press-releases.php, *last visited May 18, 2020.*

a key benchmark the White House recommended states begin to re-open."[3] As of May 18, 2020, 177 people have died of the disease in Dallas County.[4] There is no vaccine.[5]

COVID-19 causes intense pain, and recent research suggests that, in addition to the short-term risk of death posed by COVID-19, contracting the virus can lead to other serious long-term medical conditions, including cardiovascular disease and permanent reduction of lung function.[6] As one respiratory physician explained, COVID-19 causes the lungs to "become filled with inflammatory material" and to be "unable to get enough oxygen to the bloodstream."[7] This leads to acute respiratory distress syndrome, in which fluid displaces the air in the lungs, and a sensation akin to drowning.[8] The available data from the Centers for Disease Control shows that, in total, 20.7 to 31.4 percent of people who tested positive for COVID-19 require hospitalization, 4.9 to

---

[3] *See* Sue Ambrose, Holly Hacker, Anna Kuchment, *As More Texas Businesses Open Health Experts Watch and Wait*, The Dallas Morning News (May 17, 2020), *available at* https://www.dallasnews.com/news/public-health/2020/05/17/as-more-texas-businesses-open-health-experts-watch-and-wait/, *last visited May 18, 2020.*

[4] *See Dallas County Health and Human Services 2019 Novel Coronavirus (COVID-19) Press Releases*, *available at* https://www.dallascounty.org/covid-19/judge-press-releases.php, *last visited May 18, 2020.*

[5] *See* Centers for Disease Control and Prevention, What You Need To Know About Coronavirus Disease 2019 (COVID-19), CDC (2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf, *last visited May 15, 2020.*

[6] *See* Tian-Yuan Xiong et al., *Coronaviruses and the Cardiovascular System: Acute and Long-Term Implications*, European Heart Journal, at 1 (2020).

[7] *See* Graham Readfearn, *What Happens to People's Lungs When They Get Coronavirus*, The Guardian, (Mar. 24, 2020), https://www.theguardian.com/world/2020/apr/01/what-happens-to-peoples-lungs-when-they-get-coronavirus-acute-respiratory-covid-19.

[8] *See* Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica, (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

11.5 percent require admission to the ICU, and 1.8 to 3.4 percent die.[9] The World Health Organization estimates that the morality rate is higher—between 3 and 4 percent.[10]

But there may be some good news. A model produced by the University of Texas COVID-19 Modeling Consortium estimates a 52% probability that Dallas, Fort Worth and Arlington area will see its COVID-19 numbers peak in the next two weeks.[11] Of course, models can only offer probabilities, and their accuracy depends on the validity of their assumptions – this model could well be wrong. But it is a product of careful study and learned minds, and it tells us that while June 1, 2020 is, objectively, the most dangerous time to hold a jury trial, the risks may quickly begin to diminish thereafter.

A jury trial at the local peak of the pandemic poses enormous public health risks. The virus can survive on external surfaces, and can hence spread by touch.[12] But it also spreads -- perhaps primarily spreads -- through the movement of airborne droplets emitted each time someone coughs,

---

[9] *See Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020*, CDC, at tbl. (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w.

[10] *Coronavirus Disease 2019 (Covid-19) Situation Report – 46*, World Health Org, at p. 2 (2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200306-sitrep-46-covid-19.pdf?sfvrsn=96b04adf_2.

[11] *See* University of Texas COVID-19 Modeling Consortium, COVID-19 Mortality Projections for US States and Metropolitan Areas, Deaths Per Day for Dallas-Fort Worth-Arlington, Input = Texas, Dallas-Fort Worth-Arlington (May 15, 2020), *https://covid-19.tacc.utexas.edu/projections/, last visited May 15, 2020*.

[12] *See* Centers for Disease Control and Prevention, What You Need To Know About Coronavirus Disease 2019 (COVID-19), CDC (2020), *available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf, last visited May 15, 2020*.

3

laughs, or speaks,[13] all of which can be expected to occur in a jury trial. People can carry the virus without exhibiting symptoms,[14] so there is every reason to believe that substantial numbers of the trial's participants may be COVID-19 positive.

Indeed, there is special reason to fear the spread of the virus at Mr. Tanner's trial. The wife and infant son of lead defense counsel began to exhibit symptoms of COVID-19 in recent weeks, including shortness of breath and fever. While lead counsel's wife mercifully tested negative, no test was available for the baby. Counsel cannot definitively exclude the possibility of his own exposure; counsel attempted to schedule a test for himself through a remote appointment with a health care professional and was informed he did not qualify for a test at that time.

Ameliorative tools – distancing, masks, and increased airflow – guarantee nothing. The virus can almost certainly spread beyond six feet, especially in air-conditioned environments. It survives in the air for up to three hours,[15] and moves more than 6 feet away from an infected person in indoor environments. A study published by physicists at Cornell University states: "we cannot find a good justification for a stationary 6-feet separation in a situation when people spend [a] long

---

[13]  See Dr. Ramananda Ningthoujam, *COVID 19 can spread through breathing, talking, study estimates*, Curr Med Res Pract (May 8, 2020), *available at* *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7205645/, last visited May 15, 2020.*

[14] Centers for Disease Control and Prevention, *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission* (Apr. 3, 2020), *available at* *https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html, last visited May 15, 2020*

[15] Chris Ciaccia, *Coronavirus Can Remain in Air for 3 Hours, Live on Plastic for Days, New Study Says*, (Mar. 12, 2020), https://www.foxnews.com/health/coronavirus-live-plastic-stainless-steel-for-up-to-3-days; *see also* Neeltje van Doremalen, et. al, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England J. Med., (March 17, 2020), *available at* https://www.nejm.org/doi/full/10.1056/NEJMc2004973, *last visited May 15, 2020.*

4

time together in a room."[16]  The authors explain that movement of air molecules in a room can follow complex patterns, affected by "the location of air conditioners, radiators, windows, and all items in the room, as well as on people producing vortices by moving around."[17]  Importantly, the physicists conclude that these complex patterns "in the air can make a location far away from the source of droplets *more dangerous* than the location 6 feet away."[18]

Other studies support the same conclusion. A study by the University of Nebraska Medical Center detected the virus in air samples greater than 6 feet away from infected patients, and even in air samples obtained from hallways outside the patients' rooms.[19]  Another study indicated that air conditioning can spread the virus farther than anticipated within an indoor space.[20]

Masks do offer more protection than distancing. But in addition to wearing facemasks, the CDC recommends that hospitals place COVID-19 patients in Airborne Infection Isolation Rooms (AIIRs), which captures the air and expels it outside the building.[21]  These heightened measures to

---

[16] Anchordoqui LA, Chudnovsky EM. *A physicist view of the airborne infection.* Cornell University website. (Mar. 30, 2020), *available at https://arxiv.org/abs/2003.13689, last visited May 15, 2020.*

[17] *Id.*

[18] *Id.* (emphasis added).

[19] *See* Santarpia JL, Rivera DN, Herrera V, et al, *Transmission potential of SARS-CoV-2 in viral shedding observed at the University of Nebraska Medical Center* (published online Mar. 26, 2020), *available at https://doi.org/10.1101/2020.03.23.20039446, last visited May 15, 2020.*

[20] *See* Lu J, Gu J, Li K, Xu C, Su W, Lai Z, et al, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020.* EMERG INFECT DIS. 2020 Jul (Apr. 2, 2020), *available at https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article, last visited May 15, 2020*

[21] *See* Centers for Disease Control and Prevention, *What Healthcare Personnel Should Know About Caring for Patients with Confirmed or Possible Coronavirus Disease 2019 (COVID-19),* (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/caring-for-patients-H.pdf.   "AIIRs are single-patient rooms equipped with negative air pressure relative to the surrounding areas, and with

direct airflow—*in addition* to masks—suggests a risk of spreading the virus throughout buildings occupied by infected individuals.[22]

Further, the most widely available form of facial covering – a cloth mask such as a towel or bandana – does not work as effectively as a surgical mask.[23] It does not yet appear that surgical masks are widely available to the general population – even Parkland Hospital, Dallas County's main public hospital, still solicits surgical mask donations.[24] Perhaps most critically, masks do not prevent the spread of the virus when they are improperly used, which should be expected in a lay population unused to surgical protocols. As the Executive Director of the World Health Organization Emergencies Programme explained:

> There is no specific evidence to suggest that the wearing of masks by the mass population has any particular benefit. … In fact, there's some evidence to suggest

---

a minimum of 6 air changes per hour (12 air changes per hour are recommended for new construction or renovation).  Air from these rooms should be exhausted directly to the outside or be filtered through a high-efficiency particulate air (HEPA) filter directly before recirculation." Center for Disease Control and Prevention, *Airborne Infection Isolation Room (AIIR),* (Nov 5, 2015), https://www.cdc.gov/infectioncontrol/guidelines/isolation/glossary.html.

[22] *See also* Lidia Morawska and Junji Cao, U.S. National Library of Medicine National Institutes of Health, *Airborne Transmission of SARS-CoV-2: the World Should Face the Reality* (Apr. 10, 2020), (arguing that increased measures should be taken to ensure adequate ventilation within buildings given likelihood that COVID-19 spreads by air), *available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7151430/, last visited May 15, 2020.*

[23] *See* Chandini MacIntyre et al, *COVID-19, shortages of masks and the use of cloth masks as a last resort,* BMJ Open (March 30, 2020)("…the physical barrier provided by a cloth mask may afford some protection, but likely much less than a surgical mask or a respirator."), *available at https://bmjopen.bmj.com/content/5/4/e006577.responses#covid-19-shortages-of-masks-and-the-use-of-cloth-masks-as-a-last-resort, last visited May 15, 2020.*

[24] Parkland Website, *Parkland welcomes donations of personal protective equipment*, available at https://www.parklandhospital.com/ppe-donations, last visited May 15, 2020.

6

the opposite in the misuse of wearing a mask properly or fitting it properly or taking it off and all the other risks that are otherwise associated with that.[25]

Finally, there is the matter of willful non-compliance. Resistance to masks, social distancing protocols and stay-at-home orders has become an ideological movement.[26] Some people simply will not wear masks in public. And the Court can expect those willing to venture to jury duty will be more likely than the average citizen to disregard distancing and mask protocols. People who take the virus seriously will stay home.

Put simply, the risk of infection to the trial's participants is very high. But it is not merely the participants in a trial who may be endangered. Jury trials are places of community gathering and verbal exchange. If the jury system serves its function – rendering judgment based on a fair cross-section of the community – it will bring together strangers from all parts of the Division. This gives the virus access to wholly new lines of flight, transgressing any limitations it may have encountered in our more usual social networks. The decision to convene a jury trial thus implicates the rights and lives not merely of its participants, but of all of their loved ones, and anyone with whom they may come into contact.

---

[25]  *See* Adriana Rodriguez, *Should we all wear face masks to fight coronavirus? CDC says no, guidelines remain unchanged*, USA Today, (March 31, 2020)(quoting Executive Director Dr. Mike Ryan), *available at https://www.usatoday.com/story/news/health/2020/03/31/coronavirus-masks-n-95-surgical-diy-should-we-all-wearing-one/5093429002/ last visited May 15, 2020*

[26]  *See* Will Weissert and Jonathan Lemire, *Face masks make a political statement in era of coronavirus*, Associated Press, (May 7, 2020)("While most other protective measures like social distancing get broad bipartisan support, Democrats are more likely than Republicans to say they're wearing a mask when leaving home, 76% to 59%, according to a recent poll by The Associated Press-NORC Center for Public Affairs Research."), *available at https://apnews.com/7dce310db6e85b31d735e81d0af6769c, last visited May 15, 2020*

For these reasons, the Court wisely continued all jury trials until May 1, 2020.[27] This matched the virtually unanimous conclusion of federal district courts around the country: that a jury trial in the current era endangers the lives of everyone involved, and poses a serious risk to the health of the general population. Those districts that have continued jury trials until after June 1, 2020 include:[28]

- The District of Colorado

- The District of Columbia

- The Northern District of Florida

- The Southern District of Florida

- The Middle District of Georgia

- The District of Hawaii

- The Northern District of Illinois

- The Northern District of Indiana

- The Southern District of Indiana

- The Southern District of Iowa

- The Eastern District of Louisiana

- The Middle District of Louisiana

- The Western District of Louisiana

---

[27] *See* Northern District of Texas Special Order 13-5 (March 13, 2020), *available at http://www.txnd.uscourts.gov/sites/default/files/documents/COVID19.pdf, last visited May 15, 2020.*

[28] *See* Composite Exhibit A, *District Court Orders Continuing Jury Trials to Various Dates After June 1, 2020.*

8

- The District of Maine

- The Eastern District of Missouri

- The Western District of Missouri

- The Eastern District of New York

- The Southern District of New York

- The District of North Dakota

- The Western District of Oklahoma

- The Western District of Pennsylvania

- The District of Rhode Island

- The District of South Carolina

- The District of South Dakota

- The Western District of Texas

- The District of Utah

- The Western District of Virginia

- The Western District of Washington

- The Western District of Wisconsin

The outlier decision of an Ohio judge to hold a jury trial over defense objection proved disastrous.[29] The defendant was rushed to the hospital with symptoms of the coronavirus. Needless to say, it did not conclude to verdict.

---

[29] *See* Cory Shaffer, *An Ohio Judge Determined to Hold a Trial, A Defendant Removed from the Courtroom with Coronavirus Symptoms Illustrate Perils of Pandemic-era Trials*, (May 1, 2020),

9

The conditions that led this Court to continue all jury trials have, by every objective measure, worsened, not improved. Special Order 13-5 observed that on the date of the order there were "more than 1,600 confirmed cases in the United States," and "several confirmed cases within the Northern District of Texas."[30]  Today, there are 1,435,098 cases in the United States[31]  and 7,250 cases in Dallas County.[32]



_____

*https://www.cleveland.com/court-justice/2020/05/an-ohio-judge-determined-to-hold-a-trial-a-defendant-removed-from-the-courtroom-with-coronavirus-symptoms-illustrate-perils-of-pandemic-era-trials.html,   last visited May 11, 2020.*

[30]  *See* Northern District of Texas Special Order 13-5 (March 13, 2020), *available at http://www.txnd.uscourts.gov/sites/default/files/documents/COVID19.pdf, last visited May 15, 2020.*

[31]  *See* Centers for Disease Control and Prevention, Cases in the US, CDC (2020), *available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, last visited May 17, 2020.*

[32]  *See* https://www.dallascounty.org/covid-19/ , last visited May 17, 2020.

Dallas County still assesses itself at the highest risk level (red).[33] It recommends avoiding all group gatherings, including religious services and funerals.[34] Taking this guidance seriously calls on the Court to postpone the trial.  "You can't drag people down to the courthouse and make them sit together for days at a time," Texas Supreme Court Chief Justice Nathan Hecht said in an interview today. "It's just too dangerous."[35]

## II.    The denial of a continuance would be an abuse of discretion.

The decision to grant or deny a continuance is committed to the sound discretion of the trial court.[36] But the court can abuse that discretion if denying the continuance causes a party "serious prejudice."[37] In some cases, a continuance may be necessary to preserve constitutional rights of the defendant.[38] In other cases, the equities may weigh so heavily in favor of continuance as to make a contrary decision arbitrary, and a violation of due process.[39]

Under the utterly unprecedented circumstances of the present moment, a continuance is necessary: to preserve the defendant's rights effective assistance of counsel, including pre-trial

---

[33] *See* Exh. B, Dallas County COVID-19 Health Guidance for the Public.

[34] *See* Exh. B.

[35] See Nate Raymond, *Texas Prepares for a Pandemic First: a Jury Trial by Zoom*, U.S. News & World Report (May 18, 2020), *available at* https://www.usnews.com/news/top-news/articles/2020-05-18/texas-prepares-for-a-pandemic-first-a-jury-trial-by-zoom, *last visited May 18, 2020.*

[36] *See United States v. Sahley*, 526 F.2d 913, 918 (5th Cir. 1976); *United States v. Ross*, 58 F.3d 154, 158-159 (5th Cir. 1994); *United States v. Kimbrough*, 69 F.3d 723, 731 (5th Cir. 1993).

[37] *Ross*, 58 F.3d at 158-159; *Kimbrough*, 69 F.3d at 731.

[38] *See Sahley*, 526 F.2d at 918, see *Dickerson v. Alabama,* 667 F.2d 1364, 1369 (5th Cir. 1982).

[39] *See Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

preparation, trial performance, and midtrial consultation with counsel, to be tried entirely on properly admitted evidence; to be tried by a fair cross-section of the community; to meaningful confrontation; to compulsory process; to an impartial jury that can reasonably be expected to hear the evidence with the appropriate attention, and to be free of coercive verdicts; to be free of coercive pressure to plead guilty; and to the exercise of reasonable care for the safety of those endangered by state action. Finally, if the decision to grant a continuance is not compelled by the defendant's constitutional protections, the present circumstances create at least a strong case for the exercise of discretion to delay the trial.

**A.      Trial at the local peak of a deadly, highly contagious pandemic would impair the defendant's right to effective of assistance of counsel.**

Defendants enjoy a right to the assistance of counsel at all critical stages of a criminal proceeding.[40] Both the trial itself and the post-indictment period before trial constitute critical stages.[41] When defendants suffer the impairment of counsel by a state-created barrier, they need not show that the inadequate performance affected the outcome – they need only show that such barriers affected counsel's performance.[42] And in some circumstances, the effective performance

---

[40] *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).

[41] *See Kirby v. Illinois*, 406 U.S. 682, 688 (1972) (right to counsel attaches "at or after the time adversary judicial proceedings have been initiated against him").

[42] *See Smith v. Robbins*, 528 U.S. 259, 287 (2000)("various kinds of state interference with counsel's assistance' can warrant a presumption of prejudice.")(internal quotations omitted); *Perry v. Leeke*, 488 U.S. 272 (1989)(recognizing that while most claims of ineffectiveness require a showing of prejudice, "direct governmental interference with the right to counsel is a different matter.").

of counsel is so unlikely as to amount to the functional equivalent of a complete denial of counsel.[43] In these cases, reversal is automatic.[44]

Trial under the current circumstances would destroy the defendant's right to counsel in multiple ways, and would constitute both the state interference with the duties of counsel and the constructive denial of counsel altogether.

### 1. Trial on June 1, 2020 would so compromise counsel's trial performance as to constitute a complete denial of counsel; it would also destroy any meaningful right to mid-trial attorney-client consultation.

Trial in a setting that gravely threatens his or her own physical well-being – as well as that of his or her client and family -- amounts to the constructive denial of counsel.[45] Conducting a jury trial always requires immense and sustained focus. Under the best of circumstances, even a simple criminal trial presents innumerable moving parts that require the full, rapt attention of one or more attorneys. And if an attorney stumbles on any point, such a misstep may rightfully become scrutinized on appellate review, in habeas petitions, and even bar complaints.

Unfortunately, even skilled and experienced trial attorneys would find it impossible to maintain the necessary sustained focus in the current environment. At the peak of a deadly pandemic, every step an attorney takes, every pen he or she picks up, every person that wants to converse, and every cough he or she hears, could mean infection with a deadly virus. And he or she will also be seriously concerned about who will be exposed to the virus when he or she leaves court

---

[43] *See United States v. Cronic*, 466 U.S. 648 (1984); *Burdine v. Johnson*, 262 F.3d 336, 347 (5th Cir. 2001) (en banc).

[44] *See Cronic,* 466 U.S. at 659.

[45] *See Powell v. Alabama*, 287 U.S. 45, 53 (1932)(demand that counsel try a capital case on short notice and under thinly veiled threat of mob violence effectively deprived defendants of counsel).

13

each day. Preserving Mr. Tanner's rights, moreover, will require some effort to put on the record at least the most serious occasions of such distractions.

Quite apart from the question of divided attention,[46] trying the case under COVID-19 protocols will undermine counsel's ability to perform other basic functions. Counsel – like the jury, and judge – probably will not understand all of the testimony of masked witnesses, and will certainly be unable to evaluate their demeanor. Nor will counsel be able to judge the reactions of jurors or the Court. Communication with co-counsel, witnesses, and paralegals will be impaired.

Most critically, counsel will have to choose between his or her own safety and consultation with the defendant, who faces years in prison. The defendant possesses an unqualified right to consult with his attorney throughout his trial.[47] Indeed, that right prevails over even very weighty concerns of trial administration, such as the witness sequestration rule.[48]

The current setting burdens this right in several ways. The efficacy of attorney-client consultation diminishes at a distance. If the defendant and counsel can hear each other at this distance, they probably cannot speak privacy, as contemplated by the Sixth Amendment.[49] And because such conversations cannot be conducted safely, privately, and effectively, they will inevitably be conducted less frequently than necessary. Nor, of course, could such consultations be

---

[46] *See* Harold Pashler, *Dual-task interference in simple tasks: Data and theory*, Psychological Bulletin, 116(2), 220–244 (1994), *abstract available* *https://psycnet.apa.org/doiLanding?doi=10.1037%2F0033-2909.116.2.220*, *last visited May 14, 2020.*

[47] *See Geders v. United States*, 425 U.S. 80 (1976).

[48] *See Geders*, 425 U.S. at 88-92.

[49] *See Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4 (1977).

14

safely conducted at shorter distances. As discussed above, six feet offers no guarantee of personal safety from the virus, but conversations at shorter distances pose even greater dangers.

Conceivably, the Court could recess the trial each time the defendant and his counsel wished to confer, to permit a private conversation. This would exact a massive toll on the trial's efficiency, and likely generate frustration and resentment by jurors toward the defendant. Further, it would call heightened attention to the defendant's conferences with his lawyer, and increase the risk that the jury draws factual inferences of guilt from his behavior at counsel table. The defendant's consultation with his lawyer,[50] like his conduct at counsel table generally,[51] constitute improper bases for conviction.

Headsets are no answer to this problem. Interpreter headsets work well, but only because the headset wearer can easily identify the speaker – only the voice of the interpreter can be heard in the headset. In a socially distanced trial, all voices come through the headset, so there is no way to know who is speaking. And the defendant and counsel would have to use more than one set, one to converse with the trial's public participants, one to converse with each other. Some means would be required to alert counsel to put on the defense-conference headset in the midst of the rest of trial. It just isn't going to work.

   2.   ***Trial on June 1, 2020 would effectively deprive the defendant of the right to counsel in the period of pretrial preparation.***

The Supreme Court has recognized:

---

[50] *See United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980).

[51] *See United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008).

15

that the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself.[52]

A June 1, 2020 setting would compromise several important forms of pre-trial preparation.

First, counsel cannot reasonably make strategic decisions without basic knowledge about how it will be conducted. While the summons discloses some detail about the *voir dire* process, counsel remains wholly in the dark about the trial process itself.

Trial attorneys should be expert in the rules and procedures that govern the trial. Without a detailed recitation of the trial protocols, the defense can neither prepare evidence for the trial or challenge its processes. Cross-examination strategies, for example, may depend on whether a witness will be wearing a mask. Counsel cannot responsibly decide how much evidence to present without knowing how uncomfortable or fearful the jury will be when hearing it. Nor can the defense know how to display its exhibits or demonstrative aids without knowing where and how the jury will sit, or what technology is available. Further, witnesses cannot be prepared without being able to tell them how they will testify: in a mask, over closed circuit TV, at the far side of the room. Most critically, the defendant's own choice to testify may well be affected by the Court's decision about whether he is going to do so in a mask.

There is also the question of how discussions at the bench will occur during the trial. Oftentimes during a trial the parties need to discuss a matter out of earshot of the jury and those discussions take place huddled at the bench.   Will the jury be excused each time a discussion needs to occur with the Court so the parties may remain some distance from each other?

---

[52] *Maine v. Moulton*, 474 U.S. 159, 170 (1985).

Pretrial consultation has also been affected. Counsel cannot converse with the defendant or the defense witnesses live, in face-to-face confrontation, in order to judge his demeanor for possible testimony.

Put simply, the assistance of counsel that the defendant would receive in these circumstances would not be what the constitution demands. Denial of the continuance would represent an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'"[53] It would therefore violate the constitution.

**B.     Trial at the local peak of a deadly pandemic would deprive the defendant of trial before a fair cross-section of the community.**

The Sixth Amendment and 28 U.S.C. §1861 *et seq.* (the Jury Selection Act) guarantee the parties trial before a fair cross-section of the community. In order to show a violation of the statute:

> a defendant must prove a "substantial failure" to comply with its provisions. A substantial failure is one that destroys the "random nature or objectivity of the selection process."[54]

To show a Sixth Amendment violation, the defendant must show that 1) "the group alleged to be excluded [from the jury system] is a 'distinctive' group in the community," (2) "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community," and (3) "this underrepresentation is due to systematic exclusion of the group in the jury selection process."[55]

---

[53] *Morris v. Slappy*, 461 U.S. 1, 11–12, (1983) (citing *Ungar*, 376 U.S. at 589).

[54] *United States v. Hemmingson*, 157 F.3d 347, 358 (5th Cir. 1998)(internal citations omitted, quoting 28 U.S.C. § 1867(a), and *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir.1977).

[55] *Duren v. Missouri*, 439 U.S. 357, 364 (1976).

Jury summonses issued during the peak of the pandemic probably cannot produce a lawful cross-section of the community. Neither the coronavirus nor the economic dislocation it has occasioned have affected the community uniformly. Some portions of our Division have suffered higher infection rates, and experience greater risks of serious illness or death than have others.[56] Nor is fear of the virus uniform along ethnic or racial lines.[57] Because of significant racial and ethnic differentials in access to health insurance,[58] different racial and ethnic groups within our community may feel greater vulnerability to the virus in the event it is contracted.

As to the economic effects, some segments of our community have experienced elevated rates of occupational dislocation, and graver risks to family finances upon losing a job or pay-check.[59] Further, some ethnic and racial groups have higher concentrations of employment in

---

[56] *See* Centers for Disease Control, *COVID-19 in Racial and Ethnic Minority Groups*, (April 22, 2020), ("The effects of COVID-19 on the health of racial and ethnic minority groups is still emerging; however, current data suggest a disproportionate burden of illness and death among racial and ethnic minority groups."), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html., *last visited* May 14, 2020.

[57] *See* Mark Hugo Lopez, et al, *Financial and health impacts of COVID-19 vary widely by race and ethnicity*, Pew Research Center (May 5, 2020)("There are sharp racial and ethnic differences in personal experiences with COVID-19 and in concerns about spreading or catching the virus."), *available at* https://www.pewresearch.org/fact-tank/2020/05/05/financial-and-health-impacts-of-covid-19-vary-widely-by-race-and-ethnicity/ , *last visited May 14, 2020.*

[58] *See* Exh. C, Declaration of Dr. Rogelio Saenz.

[59] *See id.* ("Job and wage losses due to COVID-19 have hit Hispanic adults the hardest…. Most black and Hispanic Americans do not have financial reserves to cover expenses in case of an emergency."), *available at* https://www.pewresearch.org/fact-tank/2020/05/05/financial-and-health-impacts-of-covid-19-vary-widely-by-race-and-ethnicity/ , last visited May 14, 2020.

critical industries.[60]  Women are also concentrated in these industries.[61]  Finally, the age structure of each ethnic and racial grouping in our community varies significantly.[62]  As such, the virus's disruption of childcare arrangements will certainly affect different ethnic and racial groupings differently. These differences will almost certainly manifest themselves in differential response rates to summons.

The magnitude and breadth of social and economic change in the virus's immediate wake of the virus is absolutely vast. Predictions about the precise ways that the virus will skew summons response rates are therefore dangerous. Certainly, however, the group of people who answer the summons will not resemble that produced by this Court's pre-virus jury selection plan, which was carefully calibrated to produce a fair-cross section of the community.[63]

After reviewing the effect of COVID on Latino and African-American communities, and analyzing demographic and sociological data particular to the Dallas Division of the Northern District of Texas, Dr. Rogelio Saenz opines that convening a jury at the peak of the COVID-19

---

[60] *See* Centers for Disease Control, *COVID-19 in Racial and Ethnic Minority Groups*, (April 22, 2020)("The risk of infection may be greater for **workers in essential industries** who continue to work outside the home despite outbreaks in their communities…Nearly a quarter of employed Hispanic and Black or African American workers are employed in service industry jobs compared to 16% of non-Hispanic whites. Hispanic workers account for 17% of total employment but constitute 53% of agricultural workers; Black or African Americans make up 12% of all employed workers, but account for 30% of licensed practical and licensed vocational nurses."), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html *last visited* May 14, 2020. (emphasis in original).

[61] *See* Exh. C

[62] *See id*.

[63] *See* Jury Plan for the Northern District of Texas, as Amended June 2008, Art. VI (2008), *available at* http://www.txnd.uscourts.gov/sites/default/files/orders/misc/MiscOrder5_11209Jury.pdf, *last visited May 14, 2020.*

19

pandemic will tend to exclude African American and Latino jurors.[64]  As to African Americans, this opinion stems in part from their high rates of mortality and from the particular causes of deaths associated with the virus.[65]  In the case of Latinos, this opinion comes from that group's overrepresentation among persons who have contracted the COVID-19 virus.    As to both groups, it is due to the lack of insurance coverage, and to higher rates of health anxiety, of economic dislocation, precarity, and anxiety, and of participation in essential industries.[66]  These factors, combined with an age structure that magnifies the impact of disrupted childcare arrangements, conspire to produce a reduced degree of individual mobility among Latino and African American residents of the Dallas Division.[67]  Convening a jury in the midst of the pandemic is therefore likely to produce an unrepresentative sample of the Dallas Division.[68]

That suffices to show a violation of both the statute and the constitution. As far as the statute is concerned, the act of sending summons at the peak of a pandemic "destroys the random nature" of jury selection. A jury summons issued for service on a major religious holiday observed by a plurality of the community would not produce a "random" selection of its residents. Nor would a summons issued for the peak of a pandemic that affects its largest ethnic group more severely than its white residents. The Jury Selection Act requires a continuance.

---

[64] *See id.*

[65] *See id.*

[66] *See id.*

[67] *See id.*

[68] *See id.*

Applying the *Duren* standards for a constitutional violation likewise shows that the Sixth Amendment favors a continuance. As discussed above, the issuance of a summons for jury duty on June 1, 2020 will likely skew the venire by large margins along multiple cognizable cleavages. Further, the unequal probabilities for jury service among each group will result from systemic, rather than random, factors. The decision to convene a jury trial in this short moment of intense social dislocation represents a "procedure[] in the jury selection process that work(s) to exclude class members."[69]

Finally, even if every cognizable group in the Division had the same probability of jury selection, COVID-19 notwithstanding, it would still violate the Sixth Amendment and the Jury Selection Act to convene a jury on June 1, 2020. If we can predict nothing else about jury selection in a pandemic, one thing is almost certain: *the response rate will be abnormally low*. Because an adequate sample size is essential to random selection, this fact alone will "destroy the random nature" of the selection process. Further, it will significantly increase the likelihood that the responding population underrepresents *someone*, and hence increase the likelihood of a homogenous or statistically outlying jury. This is not a fair cross-section.[70]

**C.     Trial at the local peak of a deadly pandemic would compromise the defendant's right to meaningful confrontation.**

---

[69] *United States v. Snarr*, 704 F.3d 368, 385 (5th Cir. 2013).

[70] *See State v. Long*, 499 A.2d 264, 272 (N.J. 1985) (a system that produces homogenous venires does not produce a fair cross-section, even if each resident has an equal chance of service).

The constitution guarantees the defendant the right to confront witnesses against him.[71]  An essential component of that right is:

> the opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.[72]

Compelling witnesses to testify in a face covering would obviously impair the jury's capacity to judge the witnesses' facial expressions and demeanor when "standing face to face" and "looking at" the witnesses.

In some cases, courts have permitted witnesses to testify in facial covering to protect their safety.[73]  But in those cases, the witnesses feared retaliation, and no alternative measure could assure their safety.[74]  Thus, facial coverings furthered an important government interest and did not render the testimony unreliable.[75]  Here, by contrast, nothing more is at stake than a delay in the trial date – unmasked testimony will be perfectly safe after the pandemic. Further, if the witnesses cannot be understood, their testimony – as comprehended by the jury – is not reliable.

---

[71] *See* U.S. Const. Amend. VI.

[72] *Mattox v. United States*, 156 U.S. 237, 242 (1896); *accord Maryland v. Craig*, 497 U.S. 836, 845 (1990); *Coy v. Iowa*, 487 U.S. 1012 (1988); *California v. Green*, 399 U.S. 149 (1970).

[73] *See United States v. DeJesus-Castaneda*, 705 F.3d 1117, 1120 (9th Cir. 2013); *Romero v. State*, 173 S.W.3d 502, 503-505 (Tex.Crim.App.2005*); see also Craig*, 497 U.S. at 851 (closed circuit testimony); *United States v. El-Mezain*, 664 F.3d 467, 491-494 (5th Cir. 2011)(pseudononymous witness).

[74] *See DeJesus-Castaneda*, 705 F.3d at 1120; *Romero*, 173 S.W.3d at 503-505; *El-Mezain*, 664 F.3d at 491-494.

[75] *See DeJesus-Castaneda*, 705 F.3d at 1120; *Romero*, 173 S.W.3d at 503-505; *see also Craig*, 497 U.S. at 850 (recounting this test).

Finally, the right of confrontation may be drained of its value even if the witnesses do not testify in coverings. If the jury finds that government witnesses appear nervous or concerned about their answers, this fact may have little probative value in a pandemic. Large numbers of the trial participants will be scared to be in public during a deadly infection, a matter wholly independent of the truth of their testimony. A continuance is necessary to protect the core of the defendant's confrontation right.

**D.    Trial at the local peak of a deadly pandemic would compromise the defendant's right to compulsory process, to present evidence, and to testify.**

The Sixth Amendment promises Mr. Tanner "compulsory process for obtaining witnesses in his favor."[76] "Few rights are more fundamental than that of an accused to present witnesses in his own defense."[77] Moreover, "the right is a fundamental element of due process of law."[78] These rights carry special force when the defendant himself seeks to testify.[79] The defendant's right to testify overcomes even strong public policy concerns about the reliability of evidence, and may defeat even less than absolute prohibitions on giving testimony.[80] That right arises from dignitary concerns – the *personal* nature of the right to be heard "in his own words" -- and not solely on constitutional protections against unreliable verdicts.[81]

---

[76] U.S. Const. Amend. VI.

[77] *Taylor v. Illinois*, 484 U.S. 400, 408 (1987); *accord Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

[78] *Taylor*, 484 U.S. at 409; *accord Washington v. Texas*, 388 U.S. 14, 19 (1967).

[79] *See Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987).

[80] *See Rock*, 483 U.S. at 56-62.

[81] *Id*. at 52.

Trial at the peak of a pandemic would undermine this complex of fundamental rights. Assuming defense investigators can make service of subpoenas, the pandemic creates a serious risk of witness non-compliance. And if defense witnesses do appear, the jury cannot evaluate their credibility, whether positively or negatively, if they testify in facial coverings.

If nothing else, the need to testify in facial coverings will seriously abridge the defendant's right to be heard. This is true in a literal sense – early experience with speaking through facial coverings suggests that it is often incomprehensible. But it is also true in another sense -- the jury will not be able to see and evaluate Mr. Tanner's face when he testifies. Speech is more than expulsion of sound waves; it is a full presentation of the self, especially through facial expression. Accordingly, a defendant compelled to testify behind a mask is no more heard "in his own words" than one compelled to deliver testimony in writing.

Upon learning that the Court intended to conduct Mr. Tanner's trial on June 1, the defense reached out to our three listed witnesses as well as the defendant to gather information relevant to this decision.   Through those conversations the defense learned that Mr. Tanner is socially distancing as much as possible, however he and his wife care for his disabled brother and his wife's elderly mother.   To do this they are in regular close contact with these vulnerable individuals.   Mr. Tanner also suffers from asthma, which according to the CDC places him in a class of persons more vulnerable to COVID-19.[82]

On a scale of 1-10 (1 being no fear and 10 being extreme fear) Mr. Tanner reports a fear level of 8 and reports that if he were compelled to come into the courthouse his fear level on that

---

[82] *See* Centers for Disease Control and Prevention, People with Moderate to Severe Asthma, CDC (2020), *available at* *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html*, *last visited May 15, 2020*.

same scale of exposing other people in his household to the virus would be a 10. He believes that every time anyone sneezes or coughs he would be nervous.

Tara Paris, Mr. Tanner's wife and a listed defense witness, shares his issue of being a caretaker for her elderly mother. On a scale of 1-10 (1 being no fear and 10 being extreme fear) Ms. Paris reports a fear level of 9 and reports that if she were compelled to come into the courthouse her fear level on that same scale of exposing other people in her household or the loved ones she cares for to the virus would be a 9.

She believes that she will appear nervous in Court due to the COVID-19 pandemic and believes based on her elevated level of fear that it is possible she would not be able to focus on her testimony.

Listed defense witness Denzel Green is 51 years old and lives with his 55 year old fiancé. His fiancé suffers from the autoimmune disease lupus. His fiancé has been extremely concerned for her health since the beginning of the pandemic. Immune deficiencies are specifically listed by the CDC as a risk factor for contracting COVID-19.[83]

Listed defense witness Von Roberson is 47 years old and lives with his wife who is 50 years old.   On a scale of 1-10 (1 being no fear and 10 being extreme fear) Mr. Roberson reports a fear level of 9 and reports that if he were compelled to come into the courthouse his fear level on that same scale of exposing other people in his household to the virus would be a 10. He believes that he will appear nervous in Court due to the COVID-19 pandemic and believes based on his elevated level of fear that it is possible he would not be able to focus on his testimony.

---

[83] *See* Centers for Disease Control and Prevention, If You Are Immunocompromised, Protect Yourself from COVID-19, CDC (2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html, *last visited May 15, 2020.*

Causing witnesses to testify in a state of fear significantly prejudices Mr. Tanner. Two of the three listed witnesses are so afraid of local and global events that they believe they would appear nervous in front of the jury while testifying and may not be able to focus on their testimony. This could lead the jury to unfairly determine that they are not credible; this would not be an issue if the Court grants this motion to continue so that the trial can take place when the participants are not fearful during their appearances in Court.

Causing Mr. Tanner to appear in Court while nervous about issues unrelated to his guilt or innocence prejudices him as well. Jurors will observe him while the trial is proceeding and if he appears nervous they could unfairly interpret that as consciousness of guilt.

**E.     Trial at the local peak of a deadly pandemic would compromise the defendant's right to be present and to be judged without the effect of a prejudicial face-covering.**

Ultimately, the defendant will either attend the trial in a mask or without one. Neither option is fair to him.   Due process requires courts to consider whether the appearance of the defendant will prejudice the jury, and to take care to avoid such prejudice.[84] Thus, defendants may not be tried in prison garb,[85] nor in shackles barring clear threats to the safety or good order of the proceedings.[86] Our culture very frequently associates masks with villainy. Train bandits, Hannibal Lecter, and Klansman, figures now etched into the contemporary American subconscious, all wear masks. Indeed, this Court has even held that wearing a bandana may contribute to reasonable suspicion.[87]

---

[84] *See Estelle v. Williams*, 425 U.S. 501 (1976).

[85]  *See Williams*, 425 U.S. at 505.

[86] *See Deck v. Missouri*, 544 U.S. 622 (2005).

[87] *See United States v. Roberson*, 496 Fed. Appx. 390, 393-394 (5th Cir. 2012)(unpublished).

26

The prejudicial effect of facial covering may be even more serious for African-Americans like Mr. Tanner,[88] as anyone who lived through the "hoodie" debate after Travon Martin may recall. Even aware of the reasons, the defendant's presentation to the jury in a facial covering is dehumanizing and prejudicial. And there may well be a segment of the population that dislikes not merely the mask but the people who wear them.[89]

Alternatively, Mr. Tanner's presence without a mask could prejudice the jury against him, inviting inferences that he is selfish and reckless towards the lives of others. Some jurors may agree with New York Governor Andrew Cuomo, a major public figure in the country's COVID-19 response, who said publically that mask refusal "is insensitive, it is arrogant, it is self-destructive, it is disrespectful to other people."[90] The Court should wait until a time that it does not have to make this choice.

**F.      Trial at the local peak of a deadly pandemic would compromise the defendant's right to be trial by an impartial jury and to be free of coercive verdicts.**

---

[88] *See* Aaron Thomas, *Why I don't feel safe wearing a face mask. I'm a Black man living in this world. I want to stay alive, but I also want to stay alive*, Boston Globe (April 5, 2020), *available at https://www.bostonglobe.com/2020/04/05/opinion/why-i-dont-feel-safe-wearing-face-mask/*, *last visited May 15, 2020.*

[89]  *See* Ryan Lizza and Daniel Lippman, *Wearing a mask is for smug liberals. Refusing to is for reckless Republicans* (May 1, 2020)("On the right, where the mask is often seen as the symbol of a purported overreaction to the coronavirus, mask promotion is a target of ridicule, a sign that in a deeply polarized America almost anything can be politicized and turned into a token of tribal affiliation."), *available at https://www.politico.com/news/2020/05/01/masks-politics-coronavirus-227765, last visited May 17, 2020.*

[90]  George Back, *Andrew Cuomo on 'selfish' New Yorkers not wearing masks: 'I just don't get it'*, Yahoo Entertainment (May 7, 2020), *available at https://sports.yahoo.com/andrew-cuomo-on-selfish-new-yorkers-not-wearing-masks-i-just-dont-get-it-074031942.html, last visited May 15, 2020.*

The Supreme Court "has recognized that a defendant has a right to a tribunal both impartial and mentally competent to afford a hearing."[91]  Moreover, the jury should be reasonably attentive.[92] And it cannot be coerced into rendering a premature verdict.[93]

A trial on June 1, 2020 cannot be accomplished consistently with these principles. Jurors will not likely devote their full attention to the testimony and evidence while they worry about their safety and that of loved ones. Nor can they be expected to remain neutral in these circumstances, free of any resentment toward the prosecution for bringing the case, or, more likely, the defendant for insisting on a jury trial. Finally, when the jury returns for deliberations, the Court should not be surprised by a quick verdict to terminate the proceedings. Other than avoiding service through *voir dire* or simple non-compliance with a summons, which should both be expected as jurors seek to avoid potentially deadly exposure to the virus, the speed of the verdict will be the one way that jurors can control the duration of their viral exposure. In deciding whether a verdict is coerced, "the real question is whether the jury was required to deliberate an unreasonable length of time or for unreasonable intervals or was threatened with the prospect of such unreasonably lengthy deliberations."[94]  In the midst of a pandemic, nearly any amount of time is "an unreasonable length of time."

## G.    Trial at the local peak of a deadly pandemic would compromise the defendant's right to be free of coercive pressure to plead guilty.

[91] *Tanner v. United States*, 483 U.S. 107, 126 (1987); *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912).

[92] *See United States v. Rhodes*, 631 F.2d 43, 46 (5th Cir. 1980)("Jurors should be instructed that they should carefully listen to the evidence and not allow their note taking to distract them.").

[93] *See United States v. Fossler*, 597 F.2d 478, 485 (5th Cir. 1979).

[94] *United States v. Kimmel*, 777 F.2d 290, 295 (5th Cir. 1985).

The choice between trial and plea of guilty must be made entirely voluntarily, and without any threats or promises of unlawful action.[95] Scheduling a trial on June 1, 2020 would undermine the voluntary character of this choice in two ways.

First, denial of the continuance undermines the value of the jury trial as a means for obtaining exoneration or acquittal upon less than proof beyond a reasonable doubt. Even if the government fails to present proof beyond a reasonable doubt, Mr. Tanner may be convicted for improper reasons: because defense counsel is too distracted to mount an effective cross-examination, because the jury lacks the accumulated wisdom and experience of a diverse cross-section, because the jury cannot see a witness smirk beneath his mask, because a crucial defense witness ignores a subpoena rather than risk his or her life to the virus, because the jury feels prejudice toward the defendant because he is or is not wearing a mask, because the jury is too distracted to notice the holes in the government's case, because the jury resents Mr. Tanner's insistence on a trial, or because the last hold-out juror surrenders her honest convictions to get out of a hot zone.

Second, denial of the continuance would force the defendant to choose between his right to trial and his personal safety. The decision to waive trial by jury is not voluntary if the trial could result in death or permanent lung damage to the defendant or another participant.

**H.    Trial at the local peak of a deadly pandemic would violate the defendant's due process right to the exercise of reasonable care toward the health and safety of persons confined by state action.**

---

[95] *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Machibroda v. United States*, 368 U.S. 487, 493 (1962); *Waley v. Johnston*, 316 U.S. 101, 104 (1942); *Walker v. Johnston*, 312 U.S. 275, 286 (1941); *Chambers v. Florida*, 309 U.S. 227 (1940); *Kercheval v. United States*, 274 U.S. 220, 223 (1927).

The due process clause "imposes a duty on state actors to protect or care for citizens when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced."[96] Due process imposes a duty on state actors to protect or care for citizens in two situations: first, in custodial and other settings in which the state has limited the individuals' ability to care for themselves; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.[97] The government violates an individual's right to due process when it (1) "affirmatively place[s] [the] individual in danger," or (2) by "acting with 'deliberate indifference to [a] known or obvious danger.'"[98]

Barring a plea of guilty, Mr. Tanner is compelled to attend his own trial, as surely as he will be required to reside in a prison if convicted. And as argued above, the trial, however conducted, and certainly if conducted in a way that respects any of Mr. Tanner's procedural rights, will expose him to a serious risk of contracting the virus. Failure to continue the trial will deprive him of the due process right to physical security in the face of state-created danger.

## III.    Assuming that its discretion is not constrained by its duty to provide a fair trial and protect the health of participants, this Court should nonetheless exercise its discretion in favor of a continuance.

---

[96] *Gregory v. City of Rogers, Ark*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc).

[97] *Wells v. Walker*, 852 F.2d 368, 370 (8th Cir.1988); *see also DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 195 (1989); *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir.1990).

[98] *Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985) (a constitutional right to protection by the state exists when there is a showing that the victim faces a special danger distinguishable from that of the public at large).

If the foregoing does not establish an abuse of discretion in denying the continuance, it at least provides a strong reason to exercise discretion in its favor. Further, the COVID-19 crisis has interrupted trial preparation and disrupted the lives of lead and co-counsel, just as it has disrupted the lives of people throughout the Dallas Division. Lead counsel's preparation has been interrupted by the terrifying prospect of his wife and baby carrying the virus. Both lead and co-counsel are parents of young children, and perform work and childcare at the same time and place. Beginning March 16, 2020, the Federal Defender for the Northern District of Texas ordered its employees to telecommute to work in order to comply with CDC guidance. As such, the resources and infrastructure of the Federal Defender have all been compromised or unavailable for about two months. The same crises afflicting the community have visited the households of defense counsel, and they make a continuance appropriate.

## IV.    A continuance would not prejudice the government.

The government's case consists of a single patrol officer for the factual allegations, an interstate commerce nexus witness whose testimony could be given by anyone available to examine the firearm in question; and video footage.   The officer is locally employed as is the nexus witness. The video footage has already been electronically stored in multiple locations so it cannot be lost.

Therefore, the government would suffer no prejudice if the trial were held at a later date.   Even if the government might suffer some prejudice, it would be overwhelmingly outweighed by the risk of harm to the public and participants were the trial held in the near future.

## V.    Conclusion

We are living through historic events. The novel coronavirus will be a threat to every citizen in the world until a vaccine can be mass-produced and disseminated. This may take some time, and

certainly it is conceivable that there are some cases that will need to be tried before a jury before that day comes. But Mr. Tanner's case is not among them. To protect the safety of the public and the participants, this case must be continued.

WHEREFORE, Defendant requests that his trial be continued for a period of at least sixty days, or as the Court might otherwise direct, and that the concomitant pretrial deadlines set forth in the Court's prior scheduling order be similarly continued.

Respectfully submitted,

JASON D. HAWKINS
Federal Public Defender
Northern District of Texas

/s/ *Michael W. Kawi*
MICHAEL W. KAWI
LEAD COUNSEL
Assistant Federal Public Defender
Northern District of Texas
Florida Bar No. 100276
525 Griffin Street, Suite 629
Dallas, Texas 75202
Phone 214-767-2746
michael_kawi@fd.org

32

/s/ Jason D. Hawkins
JASON D. HAWKINS
FEDERAL PUBLIC DEFENDER
Northern District of Texas
Texas Bar No. 00795763

/s/ John M. Nicholson
JOHN M. NICHOLSON
FIRST ASSISTANT
Assistant Federal Public Defender
Northern District of Texas
Texas Bar. No. 24013240

/s/ Kevin Joel Page
KEVIN JOEL PAGE
APPELLATE SUPERVISOR
Assistant Federal Public Defender
Northern District of Texas
Texas Bar. No. 24042691

/s/ Stephanie E. Inman
STEPHANIE E. INMAN
CO-COUNSEL
Assistant Federal Public Defender
Northern District of Texas
Texas Bar. No. 24101012

## CERTIFICATE OF CONFERENCE

I certify that on May 11, 2020, I conferred with AUSA John Boyle and learned that the government is opposed to this request.

/s/ Michael W. Kawi
MICHAEL W. KAWI

## CERTIFICATE OF DEFENDANT'S CONSENT

I certify that on May 18, 2020, I spoke directly with the defendant, Mr. Timothy Tanner and, after explaining the reason for filing this motion, Mr. Tanner agreed with the filing of this motion and all requests made therein.

/s/ *Michael W. Kawi*
MICHAEL W. KAWI

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2020, I electronically filed the foregoing document using the Court's CM/ECF system, thereby providing service on attorneys of record.

/s/ *Michael W. Kawi*
MICHAEL W. KAWI