IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | NO. 3:19-CR-245-M |
| v. | ECF |
| TIMOTHY BERNARD TANNER | |

GOVERNMENT'S RESPONSE TO TANNER'S MOTION TO CONTINUE

The government opposes Tanner's motion to continue because (a) the government believes the Court can safely resume trials at this time—particularly trials like this one, which involves a single defendant and will be very limited in terms of duration—and (b) the defense's fair-representation argument is premature and likely unfounded, and his other legal arguments similarly fail.

**1.     The government supports the Court's decision to resume trials.**

As to Tanner's first set of concerns—the practicalities of the trial and keeping the participants as safe as possible—several reasons support resuming trials.   First, the government notes that the COVID-19 cases in Dallas County have followed a downward trend in the past week, which is encouraging in terms of the feasibility of resuming trials at this point.[1]   Second, the government is confident that the Court plans to implement procedures that will ensure, to the greatest extent possible, the safety of everyone

---

[1] *Dallas County Reports 171 New Coronavirus Cases on Memorial Day, Continuing Declining Trend*, Dallas Morning News, updated May 26, 2020, *available at* https://www.dallasnews.com/news/public-health/2020/05/25/dallas-county-reports-171-new-coronavirus-cases-on-memorial-day-continuing-lower-trend/.

1

involved and will, at the same time, enable the justice system to continue to operate. Third, the government anticipates that the trial in this case will be very short, and therefore any risk of exposure will be limited. Fourth, many of the safety concerns the defense has identified will not be completely eliminated until there is a vaccine, cure, or treatment for COVID-19, and it simply is not possible or practical to put trials on hold indefinitely for a year or more until one of those remedies arrives; rather, the government supports the Court exploring measures that allow jury trials to continue as safely as possible during this time.

Finally, in terms of defense counsel's possible exposure to COVID-19, he explained that his wife tested negative for the virus, and therefore it appears unlikely that she or their baby had COVID-19. But in any event, he does not state in the motion how long ago his wife and baby were sick. It sounds very possible that, by the time of trial, several days would have elapsed from the time of any exposure. His wife's and baby's past illness therefore would not prevent the trial going forward on June 1.

In sum, the practical concerns Tanner has offered are not insurmountable obstacles, and the best option at this time is to resume trials with protocols in place to ensure, to the greatest extent possible, participants' safety.

**2.    The defense's fair-representation argument and related legal arguments are premature and likely unfounded.**

As to the defense's second set of concerns—relating primarily to fair representation on the jury venire and other legal rights—these appear premature, are likely overstated, and are capable of resolution without postponing the trial.

### A. Right to a trial by jury from a fair cross-section of the community

Tanner alleges a violation of the fair cross-section requirement under 28 U.S.C. § 1861 (the Jury Selection and Service Act or JSSA) and under the Sixth Amendment. (Motion at 17-21.) Before the Court has even assembled the venire, Tanner claims that "[j]ury summonses issued during the peak of the pandemic probably cannot produce a lawful section of the community." (Motion at 18.) Tanner's claim fails because (1) it is premature; (2) he has not demonstrated any failure to comply with the JSSA; (3) he cannot meet the second or third prongs of the applicable fair cross-section test; and (4) both the JSSA and the District's Jury Plan already address the need for calling additional jurors when there is an unanticipated shortage of same. As a result, Tanner's fair cross-section claim must fail.

#### i. Tanner's claim is premature.

Tanner alleges that the Court "probably cannot" call a lawful venire, that the virus's impact on the community "will almost certainly manifest" in the response rates to summonses, that the group of people who answer the summonses "certainly" will not resemble that produced by the Court's pre-virus selection plan, and that convening a jury is "likely to produce an unrepresentative sample of the Dallas Division." (Motion at 18-20.) These claims are unfounded, speculative, and premature. A fair cross-section claim cannot arise before the venire is even called—at minimum, the second and third prongs of the fair cross-section test require showing a *pattern of venires* that lack fair and reasonable representation based on a *systematic* exclusion of same. *See Duren v.*

*Missouri*, 439 U.S. 357, 360 (1979). Furthermore, a defendant cannot establish a *prima facie* violation of the fair cross-section requirement by relying solely on the composition of the venire at his own trial. *United States v. Olaniyi-Oke*, 199 F.3d 767, 773 (5th Cir. 1999); *McGinnis v. Johnson*, 181 F.3d 686, 690 (5th Cir. 1999) ("[A] one-time example of underrepresentation of a distinctive group wholly fails to meet the systematic exclusion element of *Duren*.").[2] As a result, Tanner's claim is entirely premature and should be rejected.

### ii. Tanner has not demonstrated any substantial failure to comply with the JSSA.

"To obtain relief under the Jury Act, a defendant must prove a 'substantial failure' to comply with the Act's provisions, a substantial failure being one that destroys the random nature or objectivity of the selection process." *Olaniyi-Oke*, 199 F.3d at 772. The "happenstance" of a disproportionate jury venire is simply not enough to prevail under the Jury Act—not every venire will match the proportions of minorities in the community, given the nature of random selection and the size of the sample. *Id*.

Tanner's claim fails to challenge the selection process—"which is what § 1867 is designed for"—and instead alleges that his venire *might* fail to represent a fair cross-section of the community. *See id*. The defendant in *Olaniyi-Oke* similarly alleged that his venire had "too few" minorities. After noting that every venire would not match the

---

[2] Tanner's own cited authorities confirm as much. *See United States v. Snarr*, 704 F.3d 368, 385-86 (5th Cir. 2013) (rejecting the defendants' conclusory statements regarding a fair cross-section violation at their own trial because they failed to provide statistical data as to the representation of the relevant group on venires or in the community at large); *United States v. Hemmingson*, 157 F.3d 347, 359 (5th Cir. 1998) ("The happenstance of a disproportionately white jury is simply not enough to prevail under the Act.").

proportions of minorities in the community based on the nature of randomness, the Fifth Circuit held that the defendant's claim was not cognizable under the JSSA because no showing was made of any failure to comply with the statute.

This Court should reach the same result. Tanner claims that "the act of sending a summons at the peak of a pandemic 'destroys the random nature' of jury selection." (Motion at 20.) But he fails to identify any provision of the JSSA that would be violated, and in fact endorses the District Jury Plan as "carefully calibrated to produce a fair cross-section of the community." (Motion at 19.) As a result, Tanner has presented no cognizable claim under the JSSA.

> iii. **Tanner cannot meet the second or third prongs of the fair cross-section test.**

The Sixth Amendment and Due Process Clause of the Fifth Amendment both require that juries be drawn from a "fair cross-section" of the community. *See Berghuis v. Smith*, 559 U.S. 314, 319 (2010); *Duren*, 439 U.S. at 360; *Taylor v. Louisiana*, 419 U.S. 522 (1975); *United States v. Williams*, 264 F.3d 561, 567-68 (5th Cir. 2001). "However, this does not mean that the Constitution guarantees a 'jury of any particular composition.'" *Paredes v. Quarterman*, 574 F.3d 281, 289 (5th Cir. 2009). To establish a *prima facie* violation of the fair cross-section requirement, a defendant must demonstrate the following three prongs, commonly referred to as the *Duren* test:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;

>   (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
>
>   (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Berghuis*, 559 U.S. at 319 (citing *Duren*, 439 U.S. at 364); *Olaniyi-Oke,* 199 F.3d at 773; *United States v. Quiroz*, 137 F. App'x 667, 670 (5th Cir. 2005).   The Fifth Circuit has held that a defendant's failure to meet any one of these elements defeats the fair cross-section claim.   *Williams*, 264 F.3d at 568-69.

The defendant's initial burden is to demonstrate the percentage of the community made up of the group alleged to be underrepresented in relation to the percentage of that group in the jury venires.   *See United States v. Sanders*, 2014 WL 2600340, at *2–3 (W.D. La. June 9, 2014) (noting that "absolute disparity" is an appropriate way to measure the proportion of jury-eligible members of a distinctive group in the community versus its representation in jury venires).   Tanner attempts to meet this burden through the report of Dr. Rogelio Saenz.   (*See* Motion Ex. C.)   There, Dr. Saenz opines that "Latinos and Blacks in the region have been disproportionately hurt by the pandemic." (Ex. C at 16.)   This report postulates that "it is likely that they are less likely to be able to appear for jury summons" and that "there is the real potential for Latinos and Blacks to be underrepresented in the jury pool in the midst of the COVID-19 pandemic."   (*Id.*) But the data presented in Exhibit C fails to demonstrate that the representation of Latino and Black individuals in venires from which juries are selected is not fair and reasonable in relation to the representation of these groups in the community.   *See Berghuis*, 559

U.S. at 319. And the report underscores that any fair cross-section claim at this juncture amounts to mere guesswork—with Dr. Saenz opining that Latino and Black individuals are *likely to be less likely* to appear for the jury venire, and that there is a *potential* for underrepresentation. This type of data and analysis cannot meet the second *Duren* prong and Tanner's claim fails for that reason alone.

Nonetheless, district courts in the Eastern District of Louisiana repeatedly rejected similar claims following Hurricane Katrina—that minority displacement from the hurricane caused a systemic underrepresentation in its Jury Selection Plan—relying on the third *Duren* prong. *See, e.g.*, *United States v. Haynes*, 2006 WL 1236059, *1 at n.1 (E.D. La. May 3, 2006) (listing cases). In *Haynes*, the district court first noted that "even assuming for purposes of this motion that African-Americans were displaced disproportionately by the storm, the defendant cannot establish the second requirement, that the representation of African-Americans in venires from which juries are selected is not fair in relation to the number of such persons in the community." *Id.* at *2. But even if the defendant had demonstrated underrepresentation, he failed to demonstrate that it was the result of systematic exclusion on the government's part. "There is systematic exclusion when the under representation is due to the system of jury selection itself, rather than external forces." *Id.* (quoting *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996)) (citing cases in which demographic changes, bad weather, and natural disasters resulted in underrepresentation in the jury venire but did not amount to constitutional violations). The court ultimately held that "[i]n this case, any under representation, if it

exists, was caused by natural disaster, and not by any systematic flaw or subjectivity in the Jury Selection Plan." *Id.* at *3. As a result, the court denied the defendant's motion to quash the venire and to stay the trial proceedings.

Likewise, in *United States v. Dixon*, 2006 WL 278258, *2-6 (E.D. La. Feb. 3, 2006), the district court noted that an expert statistical report on the proportion of African Americans displaced by the three hardest hit parishes following Katrina would "contribute nothing toward proving a disproportion between the percentage of African-Americans eligible for jury duty in the community and the percentage in the defendant's jury venire," which had yet to be assembled. *Id.* at *4. However, its ultimate denial of the jury challenge turned on the defendant's failure to establish the third *Duren* prong because "[w]here external forces rather than the operation of the selection process have caused an underrepresentation, the Sixth Amendment has not been read to impose an affirmative duty on the courts to remedy that disparity." *Id.* at *5. The court explained:

> Hurricane Katrina's devastation and any resulting demographic shifts that result in a changing jury composition are manifestly external factors. They do not result from systematic exclusion of the displaced. Therefore, defendant cannot satisfy the third prong of the *Duren* analysis and cannot succeed in a Sixth Amendment claim.

*Id.* Similarly, the COVID-19 pandemic, a natural disaster in its own right, would fail to give rise to a fair cross-section claim under the third prong of the *Duren* test, even if

Tanner could demonstrate a statistically significant underrepresentation of minority groups in the venires (which he has not).[3]

### iv. The JSSA and the District Jury Plan already address the potential juror shortage.

Finally, the JSSA and the District Jury Plan both address a scenario in which there is an unanticipated shortage of available petit jurors. *See* 28 U.S.C. § 1866(f); Jury Plan at Section XIII. Specifically, the Jury Plan provides that "[w]hen there is an unanticipated shortage of available petit jurors drawn from any division's qualified jury wheel, the Duty Judge may require the marshal to summon a sufficient number of additional petit jurors selected at random from the qualified jury wheel of that division." Jury Plan at Section XIII. And the JSSA provides that "[w]hen there is an unanticipated shortage of available petit jurors drawn from the qualified jury wheel, the court may require the marshal to summon a sufficient number of petit jurors selected at random from the voter registration lists, lists of actual voters, or other lists specified in the plan,

---

[3] *See also Hearn v. Cockrell*, 73 F. App'x 79, 2003 WL 21756441, at *1, *6 (5th Cir. Jun. 23, 2003). In *Hearn*, the defendant sought a certificate of appealability on, *inter alia*, whether Dallas County violated his right to an impartial jury consisting of a cross-section of the community because "Dallas County pays jurors only five dollars per day, which results in Hispanics, persons 18 to 34 years old, and persons from households with incomes under $35,000 being underrepresented in venires and juries." *Id*. at *5. The Fifth Circuit noted that the defendant could not point to any constitutional or legal provision that explicitly excluded a distinctive group. *Id*. Instead, he pointed to an "indirect consequence of the low daily fee paid to jurors." *Id*. at *6. In denying the COA, the Court explained:

> Defendants are not entitled to a jury, jury wheel, pool of names, panel, or venire of any particular composition, and there is no requirement that those bodies "mirror the community and reflect the various distinctive groups in the population." For this reason, the underrepresentation alleged by Hearn is not unconstitutional.

*Id*. at *6; *see also Hall v. Tanner*, 2019 WL 6896890, at *9 (E.D. La. Nov. 27, 2019) (explaining that the defendant must establish that a large discrepancy occurred not just occasionally but in every weekly venire over some significant period to establish systematic underrepresentation).

in a manner ordered by the court consistent with sections 1861 and 1862 of this title." 28 U.S.C. § 1866(f). Thus, if the Court determines that an insufficient number of jurors has responded for the venire due to COVID-19, the Plan simply directs that additional jurors be summoned. No fair cross-section claim can be premised on some potential "abnormally low" response rate as a result. (*See* Motion at 21.)

### B. Tanner's other claims.

**Right to effective assistance.** Defense counsel argues that he might render ineffective assistance because of his preoccupation with preserving his own health. (Motion at 4.) The government believes that defense counsel will, consistent with his ethical obligations, render effective assistance of counsel. On that note, criminal defense counsel have been appearing in all types of hearings, including initial appearances, detention hearings, and sentencings, since the start of COVID-19's spread. Given the protocols the Court will institute to ensure safety and the brevity of this single-defendant trial, defense counsel's concerns about his own performance simply cannot support a continuance.

**Right to compulsory process, to present evidence, to confrontation, and to testify.** Tanner's concerns about his witnesses appearing at trial, (*see* Motion at 23-26), are, at best, premature, and are also likely unfounded. As with the other logistics of a trial right now, the Court will set protocols that ensure, to the greatest extent possible, the safety of witnesses, and defense counsel can explain those protocols to the witnesses before trial to allay their concerns. And in terms of counsel's concerns about the

witnesses' nervousness to testify, witnesses are often nervous about testifying for all sorts of reasons, and yet they still testify in satisfaction of a defendant's constitutional rights. The government expects the same to occur here.

In terms of the defense's concerns about the jury's ability to evaluate a witness's or the defendant's credibility if the defendant or witness wears a mask when he or she is testifying, (*see* Motion at 22-24), masks will likely be a facet of the Court's trial and hearing protocol as a safety measure for the long term, and thus this is not something that a few weeks' continuance will eliminate. Masks are also not an impediment to the jury's evaluation of credibility—the jury will still able to observe the defendant's or witness's demeanor and hear his or her voice, both of which are sufficient to allow the jury to judge a witness's credibility. And if the Court determines that masks are an impediment, it could have the witnesses wear face shields instead of masks while they testify. Relatedly, the Court could have the defendant wear a face shield or other clear covering instead of a mask while he is present in the courtroom. Again, these logistical considerations can be solved and do not warrant putting off trials for a year or more while COVID-19 remains present in the community.

**Right to trial by jury.** Tanner's concerns about the jury's inability to pay attention to the evidence and witnesses and the potential for the jury to rush to verdict so they can evacuate the federal building, (*see* Motion at 28), are overblown. The Court will explain to the jurors their solemn obligation to evaluate the evidence and testimony and that they much reach the verdict that the testimony and evidence—and not outside

concerns—dictate. And again, the Court will implement ways to protect the jury during deliberations so that the jurors will not fear for their safety in a way that would pose an incentive to rush to verdict. The fact that the evidence in this case is simple and straightforward, the single charge is uncomplicated, and the case involves only one defendant further eliminate the possibility that the jury will feel pressured to rush to verdict and will instead feel that it can safely put in the time to reach a proper verdict— whether it be guilty or not guilty.

**State-created danger.** Finally, Tanner argues that requiring him to attend his trial would violate due process by subjecting him to a state-created danger. (Motion at 29-30.) But he cites only out-of-circuit cases to support the existence of this doctrine, which, as another district court recently noted, the Fifth Circuit has not adopted:

> [W]hile the Fifth Circuit has previously outlined the applicable test for the state-created danger theory, it has never adopted the theory. *Morin v. Moore*, 309 F.3d 316, 321-22 (5th Cir. 2002) . . . . The Fifth Circuit has actually declined to adopt the state-created danger theory on multiple occasions. *See, e.g.*, *Keller v. Fleming*, ⸺ F.3d ⸺, 2020 WL 831757, at *7 (5th Cir. Feb. 20, 2020) ("[T]he Fifth Circuit has never recognized [the] 'state-created-danger' exception."); *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 688 (5th Cir. 2017) ("Panels [in this circuit] have repeatedly noted the unavailability of the [state-created danger] theory."). Thus, . . . it has never been recognized as a viable theory for recovery in the Fifth Circuit.

*Robinson v. Webster Cty., Miss.*, 2020 WL 1180422, at *9 (N.D. Miss. Mar. 11, 2020). And even if the Fifth Circuit recognized this doctrine, Tanner has cited nothing to support that a district court's scheduling of a criminal trial creates a state-created danger, and regardless, the Court is taking measures to insure the defendant's and all other

12

participants' safety and thus there is no unreasonable risk to Tanner. This, too, is not a ground for continuance.

In sum, the government supports denial of Tanner's motion to continue.

Respectfully submitted,

ERIN NEALY COX
UNITED STATES ATTORNEY

s/ John J. Boyle
John J. Boyle
Assistant United States Attorney
Texas State Bar No. 00790002
1100 Commerce Street, Third Floor
Dallas, TX 75242
Telephone: 214.659.8617
Email: John.Boyle2@usdoj.gov

CERTIFICATE OF SERVICE

I certify that on May 26, 2020, I electronically filed this document with the Clerk for the United States District Court, Northern District of Texas, using the electronic case filing ("ECF") system. The ECF system will send a "Notice of Electronic Filing" to all parties/counsel for record who have consented in writing to accept the Notice as service of this document by electronic means.

s/ John J. Boyle
John J. Boyle
Assistant United States Attorney